UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STARR ALEXIS LOWREY,<br><br>  Plaintiff,<br><br>  v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>  Defendant. | No.  2:13-cv-1917-KJN<br><br><br><br>ORDER |

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act").[1]  In her motion for summary judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was not disabled from September 28, 2009, the date plaintiff's application was filed, through the date of the final administrative decision.  (ECF No. 12.)  The Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary judgment.  (ECF No. 15.)  Thereafter, plaintiff filed a reply brief.  (ECF No. 16.)

////

---

[1] This action was initially referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15), and both parties voluntarily consented to proceed before a United States Magistrate Judge for all purposes.  (ECF Nos. 7, 8.)

1

For the reasons that follow, the court denies plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for summary judgment, and enters judgment for the Commissioner.

I. BACKGROUND

Plaintiff was born on December 2, 1969, did not graduate from high school, and previously worked as an in-home caretaker.[2]  (Administrative Transcript ("AT") 22, 52, 59-60.) On September 28, 2009, plaintiff applied for SSI, alleging that she was unable to work as of June 15, 2009.  (AT 14, 158-60.)  On March 11, 2010, the Commissioner determined that plaintiff was not disabled.  (AT 14, 97-101.)  Upon plaintiff's request for reconsideration, the determination was affirmed on October 4, 2010.  (AT 102-107.)  Thereafter, plaintiff requested a hearing before an administrative law judge ("ALJ"), which took place on August 8, 2011, and at which hearing plaintiff (represented by counsel) testified.  (AT 14, 47-94.)

In a decision dated January 23, 2012, the ALJ determined that plaintiff had not been under a disability, as defined in the Act, from September 28, 2009, the date plaintiff filed her application, through the date of the ALJ's decision.  (AT 14-23.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on July 17, 2013.  (AT 1-7.)  Thereafter, plaintiff filed this action in federal district court on September 15, 2013, to obtain judicial review of the Commissioner's final decision.  (ECF No. 1.)

II. ISSUES PRESENTED

Plaintiff raises the following five issues:  (1) whether the ALJ's decision failed to properly account for plaintiff's severe and non-severe impairments; (2) whether the ALJ erred in evaluating the medical evidence in the record when making her RFC determination; (3) whether the ALJ made an improper credibility determination with respect to plaintiff's testimony; (4) whether the ALJ made an improper credibility determination with respect to the third party report

---

[2] Because the parties are familiar with the factual background of this case, including plaintiff's medical and mental health history, the court does not exhaustively relate those facts in this order. The facts related to plaintiff's impairments and treatment will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

of plaintiff's fiancé, Edward Johnson; and (5) whether the ALJ erred in utilizing the Medical-Vocational Guidelines at Step Five to determine that there were jobs that existed in significant numbers in the national economy that plaintiff could have performed.

III.   LEGAL STANDARD

The court reviews the Commissioner's decision to determine whether:  (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g); and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007) (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citation omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

IV.   DISCUSSION

  A.   Summary of the ALJ's Findings

The ALJ evaluated plaintiff's entitlement to SSI pursuant to the Commissioner's standard five-step analytical framework.[3]  At the first step, the ALJ concluded that plaintiff had not

---

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program.  42 U.S.C. §§ 401 et seq.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

3

engaged in substantial gainful activity since September 28, 2009, the date plaintiff filed her application. (AT 16.) At Step Two, the ALJ determined that plaintiff had the following severe impairments: "antisocial personality disorder, malingering, and depression." (Id. (citations omitted).) However, at step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AT 17.)

Before proceeding to step four, the ALJ assessed plaintiff's residual functional capacity ("RFC") for the relevant time period as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple repetitive tasks, can have no interaction with the public, and can have occasional interaction with co-workers and supervisors.

(AT 17.)

At step four, the ALJ found that plaintiff was unable to perform any past relevant work. (AT 22.) Finally, at step five, the ALJ determined that, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed, specifically, unskilled work at any exertional level. (AT 22-23.)

---

> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

4

Accordingly, the ALJ concluded that plaintiff had not been under a disability as defined in the Act from September 28, 2009, through the date of the ALJ's decision.  (AT 23.)

      B.      <u>Plaintiff's Substantive Challenges to the Commissioner's Determinations</u>

          1.      *Whether the ALJ Failed to Properly Account for Plaintiff's Severe and Non-Severe Impairments*

First, plaintiff contends that the ALJ erred in her assessment at Step Two because she failed to list "paranoid-type schizophrenia, psychotic disorder, or any impairment of that sort," as "severe impairments" despite the existence of evidence in the record that plaintiff suffered from these types of impairments.  (ECF No. 12 at 7-8.)

Under the Commissioner's regulations, an impairment or combination of impairments is deemed to be severe at Step Two if it "significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 404.1521(a).  As the Ninth Circuit Court of Appeals has explained, "the step-two inquiry is a de minimis screening device to dispose of groundless claims.  An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996) (internal citations and quotation marks omitted).

Here, the ALJ found that only "antisocial personality disorder, malingering, and depression" were "severe impairments" for purposes of Step Two (AT 16); the ALJ did not discuss whether any of the impairments mentioned by plaintiff were "severe" for purposes of this step.  Regardless, substantial evidence from the record supported the ALJ's Step Two determination.

While the record demonstrates that plaintiff had been diagnosed with schizophrenia or a psychotic disorder by several physicians, there is no evidence that those impairments were "severe" for Step Two purposes.  For example, much of the evidence regarding the severity of these impairments is in the form of plaintiff's own subjective complaints made to her treating and examining physicians (<u>e.g.</u>, 394, 402, 411, 437, 447, 454-55), rather than from the doctors' own evaluations.  Furthermore, the mere fact that some of plaintiff's treating physicians diagnosed

5

1  plaintiff with these mental disorders does not necessarily mean that those conditions were
2  "severe" such that they "significantly limit[ed plaintiff's] physical or mental ability to do basic
3  work activities." 20 C.F.R. §§ 404.1520(c), 404.1521(a).  The doctors who diagnosed plaintiff
4  with these disorders noted that these conditions generally improved when plaintiff was not using
5  street drugs and was taking prescribed medication for these conditions.  (See,e.g., AT 395,400,
6  403, 440); cf. Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006)
7  ("Impairments that can be controlled effectively with medication are not disabling for the purpose
8  of determining eligibility for SSI benefits.").  Furthermore, the medical records from the doctors
9  who diagnosed plaintiff with these conditions do not provide any indication that they had a
10  significant impact on her ability to perform basic work-related activities and plaintiff points to no
11  other evidence in the record indicating that the ALJ should have considered these impairments to
12  be severe.  Based on this evidence, and the record as a whole, the ALJ properly determined that
13  the impairments plaintiff cites to were not sufficiently severe enough to warrant their inclusion at
14  Step Two as "severe impairments" because they did not significantly affect plaintiff's ability to
15  perform basic work activities.

16  Moreover, even assuming *arguendo* that the ALJ technically erred by not finding that
17  these impairments constituted severe disorders at Step Two, such error is harmless if the ALJ
18  proceeded to consider the effects of those impairments at subsequent steps.  See Lewis v. Astrue,
19  498 F.3d 909, 911 (9th Cir. 2007).  Here, because the ALJ found other impairments to be severe
20  at Step Two, the ALJ proceeded to subsequent steps of the sequential disability evaluation
21  process.  Plaintiff argues that the ALJ committed reversible error by not considering the effects of
22  these impairments when considering plaintiff's RFC.  Contrary to plaintiff's argument, however,
23  the ALJ based his RFC assessment upon a "careful consideration of the entire record."  (AT 17.)
24  The record contains references to plaintiff suffering from schizophrenia and other psychotic
25  disorders, and it can be reasonably inferred that the ALJ at least considered each of these
26  diagnoses in rendering her decision.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d
27  1155, 1164 (9th Cir. 2008).  Furthermore, the ALJ expressly noted these findings in her RFC
28  assessment.  (See AT 19.)  Accordingly, even if the ALJ were to have erred by not determining

that the impairments plaintiff mentions were severe for Step Two purposes, it was, at most, harmless.[4]

Plaintiff also argues that the ALJ improperly considered her impairments at Step Three of the analysis because she failed to find that plaintiff's impairments met a listing and did not adequately explain her reasons for why plaintiff's impairments did not rise to listing-level severity.

At step three, the ALJ determines whether "a claimant's impairment meets or equals an impairment listed in [20 C.F.R. part 404, subpart P, appendix 1]." Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999). The Listing of Impairments describes specific impairments of each of the major body systems "which are considered severe enough to prevent a person from doing any gainful activity." Id. (citing 20 C.F.R. § 404.1525). If a claimant meets or equals a listed impairment he or she will be found disabled at this step without further inquiry. Tackett, 180 F.3d at 1099 (citing 20 C.F.R. § 404.1520(d)).

A claimant bears the burden of proving that his or her impairments satisfy all the criteria of a particular listing. Tackett, 180 F.3d at 1099 ("[Claimant] had to establish that he [or she] met or equaled each of the following characteristics of a listing."). "For a claimant to show that his [or her] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in original).

In the present case, the ALJ concluded at step three that plaintiff "does not have an impairment or combination of impairments that meets or equals one of the listed impairments in

---

[4] Plaintiff also argues that the ALJ improperly considered the physical injury to plaintiff's left knee, which the ALJ found to be a non-severe impairment. (AT 17.) Specifically, plaintiff claims that the ALJ improperly failed to include in her RFC determination a discussion of the effect plaintiff's knee injury had on plaintiff's mental impairments such as depression. (ECF No. 12 at 7.) However, as noted above, the ALJ made her RFC determination based on a careful consideration of the entire record, including the evidence in the record concerning plaintiff's knee injury. Moreover, a review of the record plainly shows a lack of any evidence indicating that plaintiff's knee injury had any material impact on her mental impairments. Accordingly, even if the ALJ failed to consider the impact of this impairment on plaintiff's RFC, such error was harmless.

7

1  20 CFR Part 404, Subpart P, Appendix 1." (AT 17.) In coming to this conclusion, the ALJ found
2  "that [plaintiff's] impairments do not meet or equal any listing, especially Listing 12:04, because
3  there is no medical evidence to support a listing-level impairment." (Id.) Plaintiff argues that the
4  ALJ erred in her conclusion that plaintiff's impairments do not meet a listing. Plaintiff further
5  clarifies in her reply briefing that the ALJ erred specifically because she failed to consider
6  Listings 12.03 and 12.08 and explain why plaintiff's impairments did not meet those listings.
7  However, contrary to plaintiff's contention, the ALJ noted in her decision that she had considered
8  *all* listings in making this determination, not just Listing 12.04. (AT 17 ("[Plaintiff's]
9  impairments do not meet or equal *any* listing." (emphasis added)).)

10  Moreover, the ALJ's determination that plaintiff's impairments did not rise to the level of
11  Listing 12.03 or Listing 12.08 was supported by substantial evidence. Listing 12.03 concerns
12  schizophrenic, paranoid and other psychotic disorders. As noted above with respect to the ALJ's
13  Step Two determination, the ALJ's finding that plaintiff's schizophrenia and other psychotic
14  diagnoses were not "severe" was supported by substantial evidence in the record, thus indicating
15  that plaintiff's mental impairments of this type did not even significantly limit plaintiff's mental
16  ability to do basic work activities, let alone reach the more stringent requirements of Listing
17  12.03.

18  Similarly, the record does not support plaintiff's contention that her impairments met the
19  requirements of Listing 12.08, which concerns personality disorders. While the ALJ did find that
20  plaintiff had an antisocial personality disorder that was sufficiently "severe" for Step Two
21  purposes and found that this impairment placed non-exertional limitations on plaintiff's ability to
22  interact with the public, supervisors, and coworkers, the evidence in the record substantially
23  supports the ALJ's finding that plaintiff did not meet Listing 12.08. With respect to the "B"
24  criteria set forth in Listing 12.08, even if it were presumed that plaintiff's limitations regarding
25  contact with the public and coworkers were "marked" in nature, the evidence does not show that
26  plaintiff also had marked difficulties with respect to activities of daily living or in maintaining
27  /////
28  /////

concentration, persistence, or pace, or had repeated episodes of decompensation, as would be required to meet Listing 12.08.[5]

Moreover, as noted above, the claimant "bears the burden of proving that . . . she has an impairment that meets or equals the criteria of an impairment listed in Appendix 1 of the Commissioner's regulations." Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005); Tackett, 180 F.3d at 1099.  Here, plaintiff failed to articulate a plausible theory regarding how the specific criteria of any Listing is met or equaled.  Accordingly, the ALJ's Step Three determination was without error.

2.  *Whether the ALJ Erred in Evaluating the Medical Evidence in the Record when Making her RFC Determination*

Plaintiff next argues that the ALJ incorrectly assessed plaintiff's RCF.  Specifically, plaintiff asserts two arguments with respect to this aspect of the ALJ's decision.  First, plaintiff argues that the ALJ improperly assigned "no weight" to the opinion of Dr. Regazzi, an examining psychologist retained by plaintiff's attorney.  Second, plaintiff argues that the ALJ's overall RFC assessment does not correspond to the limitations opined by plaintiff's physicians.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

/////

---

[5] In order to meet Listing 12.08, a claimant must be able to show that that she meets the requirements of both subsections "A" and "B."  To satisfy the criteria set forth in subsection "B," the claimant must be able to show that she has at least two of the following:  "(1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.08.  The only medical evidence in the record indicating the existence of such "marked" limitations comes in the form of Dr. Regazzi's opinion, which, for the reasons set forth below, was properly discounted by the ALJ.

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. Lester, 81 F.3d at 830-31. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001), except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

Dr. Regazzi examined plaintiff on November 8, 2011, to assess plaintiff's cognitive functioning abilities. During the examination, Dr. Regazzi conducted a clinical interview of plaintiff, reviewed the examination records of Dr. Richwerger, an examining psychologist who had examined plaintiff roughly one month prior to Dr. Regazzi, and tested plaintiff using the Weschler Adult Intelligence Scale ("WAIS-IV") and Wide Range Achievement Test ("WRAT-4"). (AT 587.) Plaintiff's WAIS-IV results showed that she had a full scale IQ of 60, falling within the deficient range. (AT 589.) Her WRAT-4 results showed a reading score of 55, a spelling score of 55, and a math score of 56, all indicating deficient performance. (Id.) Dr. Regazzi noted in her report that plaintiff "was encouraged to perform to the best of her ability and appeared to do so" when taking the WAIS-IV and WRAT-4 tests. (Id.) Based on this encouragement, Dr. Regazzi considered plaintiff's scores on these tests "to be an accurate reflection of her current level of functioning." (Id.)

1    Dr. Regazzi diagnosed plaintiff with cocaine abuse, depressive disorder not otherwise
2 stated, mild mental retardation, antisocial personality traits, self-reported chronic knee and back
3 pain, and a GAF score of 45. (AT 590.) Ultimately, Dr. Regazzi opined that plaintiff's
4 diagnosed mental impairments imposed the following restrictions: marked impairment in the
5 ability to understand, remember, and carry out simple instructions; severe impairment in the
6 ability to understand, remember, and carry out complex instructions; marked impairment in the
7 ability to maintain adequate pace; moderate impairment in the ability to maintain attention and
8 concentration; mild impairment in the ability to communicate effectively with others; moderate
9 impairment in the ability to interact appropriately with supervisors and coworkers; and moderate
10 impairment in the ability to interact appropriately with the public. (AT 590-91.)

11    The ALJ stated the following reasons for assigning "no weight" to Dr. Reggazi's opinion:

> I give no weight to the opinion of Dr. Regazzi. Dr. Regazzi reviewed Dr. Richwerger's evaluation, performed the same tests Dr. Richwerger gave the claimant in October 2011 (one month earlier), and noted that the results obtained by Dr. Richwerger were considered invalid due to questionable effort. For the evaluation conducted by Dr. Regazzi, she merely noted that the claimant was encouraged to perform to the best of her ability but did not use the Test of Memory Malingering testing to verify the claimant's actual effort. The results on Dr. Regazzi's testing vary only slightly from the results Dr. Richwerger obtained but Dr. Regazzi relies on the results of her testing without indicating why Dr. Richwerger's results were not also relied upon. Dr. Regazzi does not rely upon Dr. Nakagawa's report, which shows that the claimant gave a 'poor, limited effort on all testing,' and thus resulting in test results that were deemed unreliable and invalid. Dr. Regazzi does not address this issue at all. Dr. Regazzi does not provide a coherent reason as to why her results were valid but Dr. Richwerger's and Dr. Nakagawa's results were not. Dr. Regazzi's conclusions that the claimant's functional abilities are markedly and severely impaired are not supported by any valid or credible testing evaluation, or medical evidence of record.

23 (AT 21.) These reasons given by the ALJ were specific and legitimate reasons for rejecting Dr.
24 Regazzi's opinion that were based on substantial evidence in the record.
25    One month prior to Dr. Regazzi's examination, Dr. Richwerger, a psychologist retained
26 by the Commissioner to conduct a consultative examination, examined plaintiff and administered
27 a number of psychological tests, including the same WAIS-IV test administered by Dr. Regazzi.
28 (AT 565.) Plaintiff's WAIS-IV scores from this examination revealed a full scale IQ of 50;

11

1   plaintiff's other scores were similarly poor.  (See AT 569-71.)  However, Dr. Richwerger found
2   these test scores to be invalid after administering the Test of Memory Malingering ("TOMM").
3   Dr. Richwerger opined that plaintiff's poor scores on the tests administered during the
4   examination "appear[ed] to be significant underestimates due to a performance consistent with a
5   low level of effort."  (AT 569.)  Based on the finding that plaintiff was malingering during the
6   examination, Dr. Richwerger opined that he could not give plaintiff a valid functional assessment
7   but did diagnose plaintiff with polysubstance abuse and Cluster B personality traits based on
8   plaintiff's statements concerning her history.  (AT 572.)

9      Dr. Nakagawa, another examining psychologist, examined plaintiff on January 21, 2010,
10  prior to both Dr. Regazzi's and Dr. Richwerger's examinations.  During this examination, Dr.
11  Nakagawa noted that plaintiff pulled on her jacket and screamed statements such as "get off me"
12  multiple times during the examination in a manner that Dr. Nakagawa described as "contrived
13  and melodramatic."  (AT 299.)  Plaintiff asserted that she experienced hallucinations that affected
14  all senses even though Dr. Nakagawa found her speech to be relevant and coherent.  (Id.)  Dr.
15  Nakagawa also found that plaintiff "put forth very poor, limited effort on all testing," including
16  WRAT-4 testing that produced a score of 55 in reading, spelling, and math.  (AT 301-02.)  After
17  administering the TOMM, Dr. Nakagawa found that there was "clear evidence of malingering" on
18  plaintiff's part, thus making any test data "unreliable and invalid."  (Id.)  Ultimately, Dr.
19  Nakagawa diagnosed plaintiff with malingering.  (AT 303.)

20     Dr. Regazzi noted in her report that she had reviewed Dr. Richwerger's opinion and the
21  fact that Dr. Richwerger found the examination results invalid due to plaintiff's questionable
22  efforts when taking the tests she had been administered.  (AT 587.)  However, Dr. Regazzi did
23  not review Dr. Nakagawa's report that demonstrated signs of malingering on plaintiff's part that
24  were similar to those exhibited during Dr. Richwerger's examination event though the report was
25  available at that time.  Furthermore, Dr. Regazzi did not administer the TOMM or do anything
26  else to ensure that plaintiff was not malingering beyond verbally encouraging plaintiff to perform
27  to the best of her ability despite having reviewed Dr. Richwerger's then-recent examination report
28  that found plaintiff to be malingering after obtaining test results similar to those obtained via Dr.

1  Regazzi's own testing. The ALJ correctly pointed to these facts as reasons for assigning "no
2  weight" to Dr. Regazzi's opinion.

3  The fact that both Dr. Richwerger and Dr. Nakagawa found plaintiff to be clearly
4  malingering after plaintiff obtained similar test results to those found by Dr. Regazzi shows that
5  their opinions contradicted Dr. Regazzi's opinion despite the fact that they obtained similar test
6  results. Accordingly, the ALJ had to only provide specific and legitimate reasons supported by
7  substantial evidence in the record in order to properly dismiss Dr. Regazzi's opinion. Lester, 81
8  F.3d at 830. The fact that Dr. Regazzi did not make any effort to ensure that plaintiff was not
9  malingering or trying to produce inaccurate results on the administered tests beyond verbal
10 encouragement that plaintiff try her best despite the existence of other, then-recent medical
11 opinions indicating that plaintiff had not given her full efforts when taking the same tests and
12 obtaining similar results, was a specific and legitimate reason for dismissing Dr. Regazzi's
13 opinion. Accordingly, the ALJ did not err in assigning the opinion "no weight."

14 Plaintiff also argues that the ALJ's RFC assessment was in error because there was no
15 basis in the evidentiary record to support such findings. Specifically, plaintiff asserts that the
16 mental limitations the ALJ ascribed to plaintiff regarding restrictions concerning contact with
17 others were not reflected in the medical opinions in the record. However, it is "the responsibility
18 of the ALJ, not the claimant's physician[s], to determine residual functional capacity." Vertigan
19 v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001). The ALJ was not required to adopt only
20 limitations specifically set forth in the medical opinions in the record. Rather, there only needed
21 to be substantial evidence in the record to support the ALJ's RFC determination. Here, there
22 existed such substantial evidence to support the ALJ's RFC findings that plaintiff was limited to
23 work involving simple repetitive tasks, no interaction with the public, and occasional interaction
24 with co-workers and supervisors. (AT 17.) Throughout the record, there is evidence that
25 plaintiff's mental impairments limited her ability to engage in more complex tasks and to interact
26 with others. (See,e.g., AT 89-90, 187-88, 196, 220, 403.) The ALJ's RFC determination
27 properly weighed and reflected that evidence. Accordingly, the ALJ did not err in assessing
28 plaintiff's RFC.

     3.     *Whether the ALJ Made an Improper Credibility Determination with Respect to Plaintiff's Testimony*

Next, plaintiff argues that the ALJ improperly found plaintiff's testimony to lack credibility when assessing this evidence for RFC purposes.

A claimant's subjective statements and statements made by laypersons should be considered by the ALJ, but they need not always be accepted as true. In Lingenfelter v. Astrue, 504 F.3d 1028 (9th Cir. 2007), the Ninth Circuit summarized the ALJ's task in assessing a claimant's credibility:

> To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. [But t]he claimant … need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.
>
> Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so….

Lingenfelter, 504 F.3d at 1035-36 (citations and quotation marks omitted).

However, "the ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking . . . ." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The "ALJ must . . . identify what testimony is credible and what testimony undermines the claimant's complaints." Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (quoting Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)). In weighing a claimant's credibility, an ALJ may consider the claimant's reputation for truthfulness, inconsistencies in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002) (citing Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)). If

the ALJ's credibility finding is supported by substantial evidence in the record, the court may not engage in second-guessing. Id. at 959.

Here, the ALJ was required to provide clear and convincing reasons for discounting plaintiff's credibility. The ALJ gave the following reasons for finding plaintiff's testimony not fully credible:

> First, she continues to abuse alcohol and street drugs. A December 2010 toxicology screen was positive for cocaine. Second, her testimony that she heard voices when clean and sober is not entirely credible in light of the overall evidence. When she stopped using cocaine and alcohol for two weeks, she noticed a marked improvement in her mood and symptoms. It is a reasonable inference that if the claimant were to abstain from drugs and alcohol for a sustained period of time, the claimant's symptoms would markedly improve or disappear altogether. She conceded that when she regularly takes her medication she does not hear voices. However, she is not compliant with mental health care. Furthermore, the claimant failed to attend one scheduled consultative examination and malingered at the two she did attend. Her activities of daily living of using public transportation, washing dishes, cleaning the bathroom, vacuuming, mopping, doing laundry, and cooking for herself and her sister are not consistent with allegations of debility. She goes to retail stores, although she said that she had problems dealing with salespeople. In sum, her testimony that she is as limited as she alleges is not credible.

(AT 21 (internal citations omitted).) These reasons were clear and convincing.

First the ALJ found that the evidence in the record demonstrated that if plaintiff had remained off street drugs and regularly took her prescribed medications, then many of her claimed symptoms would have markedly improved. However, plaintiff was not fully compliant with this course of treatment. A claimant's "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" is a specific and legitimate reason for finding a claimant not credible. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); cf. 20 C.F.R. § 404.1530 ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . ."). Here, there is substantial evidence in the record corroborating the ALJ's determination. Plaintiff's treating records demonstrate that plaintiff missed treatment appointments, used street drugs on an off and on basis, and ran out of prescribed medications prior to her scheduled appointments. (E.g., AT 375, 395, 397-98, 400, 403-04.)

1  Accordingly, the ALJ properly found plaintiff's statements regarding the severity of her
2  impairments not credible on the basis that she did not fully comply with her prescribed
3  treatments.
4      Even more compelling is the ALJ reasoning that plaintiff's failure to give her full effort
5  during the two consultative examinations that were invalidated by findings of malingering, and
6  complete avoidance of another examination, revealed plaintiff to not be credible.  The ALJ
7  properly interpreted these actions as evidencing plaintiff's lack of credibility with respect to
8  plaintiff's claims concerning the limitations her mental impairments impose on her.  See Thomas
9  v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) ("[The claimant's] efforts to impede accurate
10 testing of her limitations supports the ALJ's determinations as to her lack of credibility.")
11 Substantial evidence in the record, particularly the examinations performed by Dr. Richwerger
12 and Dr. Nakagawa, supports the ALJ's finding that plaintiff engaged in efforts to impede accurate
13 testing of her mental limitations.
14     Finally, the ALJ also properly reasoned that the discrepancy between plaintiff's daily
15 living activities during the claimed disability period and plaintiff's allegations of debility
16 constituted a basis for discounting plaintiff's testimony.  "[T]he ALJ may discredit a claimant's
17 testimony when the claimant reports participation in everyday activities indicating capacities that
18 are transferable to a work setting . . . Even where those activities suggest some difficulty
19 functioning, they may be grounds for discrediting the claimant's testimony to the extent that they
20 contradict claims of a totally debilitating impairment."  Molina v. Astrue, 674 F.3d 1104, 1113
21 (9th Cir. 2012) (citations omitted).  Plaintiff testified that she regularly used public transportation,
22 did certain household chores, sometimes cooked meals, went for walks with her "spouse [sic]",
23 went to church, and went shopping.  (AT 57, 68-72, 182, 184-86.)  The ALJ found that these
24 activities contradicted plaintiff's claimed debility.  This finding is supported by substantial
25 evidence in the record.  The ALJ could reasonably conclude that plaintiff's activities, such as
26 shopping, and taking walks with her spouse, going to church, and taking public transportation,
27 undermined her allegations that she was incapable of being around other people without suffering
28 from debilitating anxiety.  Accordingly, the ALJ's stated reasons for finding plaintiff's testimony

1  not credible were not erroneous.

2            4.      *Whether the ALJ Made an Improper Credibility Determination with Respect to the*
3                     *Third Party Report of Plaintiff's Fiancé, Edward Johnson*

4         Plaintiff further argues that the ALJ improperly discounted the third party report offered

5  by plaintiff's fiancé, Edward Johson. "[C]ompetent lay witness testimony cannot be disregarded

6  without comment" and "in order to discount competent lay witness testimony, the ALJ must give

7  reasons that are germane to each witness." Molina, 674 F.3d at 1114 (internal quotation and

8  citation omitted).

9         Here, the ALJ gave two reasons for discounting Mr. Johnson's report. First, the ALJ

10 determined that Mr. Johnson's statement that plaintiff had not had a job since she was a teenager

11 was "contradicted by [plaintiff's] own testimony." (AT 22.) Second, the ALJ determined that

12 Mr. Johnson's testimony regarding plaintiff's engagement in daily activities such as cooking,

13 walking, doing household chores, taking public transportation, and shopping was not consistent

14 with plaintiff's testimony concerning the disabling nature of her impairments. (Id.) Essentially,

15 the ALJ highlighted two instances in which Mr. Johnson's statements were contradictory to

16 plaintiff's testimony as a basis for discounting Mr. Johnson's third party report.

17        Mr. Johnson's comments concerning plaintiff's work history were in direct contradiction

18 to plaintiff's testimony regarding the last time she had a job. Mr. Johnson stated in the third-party

19 statement he submitted on November 1, 2009, in support of plaintiff's application that plaintiff

20 had not had a job since she was a teenager. (AT 196.) To the contrary, plaintiff testified during

21 the August 8, 2011 hearing before the ALJ that she had worked as an in-home support worker

22 two to three years prior to that date. (AT 60.) Similarly, plaintiff noted in her own disability

23 report that she had worked as an in-home care provider from 2002 to June 15, 2009. (AT 177.)

24 Given that Mr. Johnson stated in his report that he had known plaintiff for fifteen years and that

25 he was plaintiff's "spouce [sic]," this incongruity between his statement and plaintiff's statements

26 concerning plaintiff's work history is even more striking. The ALJ noted this inconsistency

27 between Mr. Johnson's statements and plaintiff's testimony and found that it limited the

28 persuasiveness of his report. This constituted a germane reason for discounting Mr. Johnson's

1  testimony because this inconsistency gives rise to a reasonable inference that Mr. Johnson's

2  recollection of plaintiff's activities was not entirely accurate.

3        Similarly, the discrepancy between Mr. Johnson's statements concerning plaintiff's daily

4  activities and plaintiff's own claims regarding the debilitating nature of her mental condition

5  constituted a germane reason for discounting Mr. Johnson's testimony.  As the ALJ noted, Mr.

6  Johnson stated that plaintiff could cook, do certain household chores, go on walks, use public

7  transportation, shop for groceries, and go to church on a regular basis.  (AT 192-94.)  As noted

8  above with respect to plaintiff's credibility determination, such testimony regarding plaintiff's

9  living activities contradicted plaintiff's own claims of the debilitating nature of her mental

10 condition.  Such contradiction between a claimant's testimony concerning her living activities and

11 her claimed debilities may constitute a clear and convincing reason for finding the claimant's

12 testimony not credible.  See Molina, 674 F.3d at 1113.  Accordingly, such a discrepancy between

13 a third party report's statements concerning the claimant's daily living activities and the

14 claimant's allegations concerning the extent of her disability may also constitute a "germane"

15 reason for discounting the third party's testimony.  Therefore, the ALJ did not err in dismissing

16 Mr. Johnson's third-party report for this reason.

17       Both of the contradictions highlighted by the ALJ constituted germane reasons for

18 assigning limited weight to Mr. Johnson's third-party statements.  Accordingly, the ALJ did not

19 err in finding Mr. Johnson's statements unpersuasive.

20       5.    *Whether the ALJ Erred in Utilizing Only the Medical-Vocational Guidelines at*

21           *Step Five*

22       Finally, plaintiff argues that the ALJ erred when she utilized only the Medical-Vocational

23 Guidelines (the "grids") in making her Step Five determination because plaintiff's non-exertional

24 limitations were sufficiently severe enough to necessitate the ALJ's use of vocational expert

25 testimony at Step Five.

26       The grids take administrative notice of the numbers of unskilled jobs that exist throughout

27 the national economy at various functional levels.  20 C.F.R. Part 404, Subpart P, Appendix 2, §

28 200.00(b).  "The ALJ can use the grids without vocational expert testimony when a non-

exertional limitation is alleged because the grids provide for the evaluation of claimants asserting both exertional and non-exertional limitations. But the grids are inapplicable when a claimant's non-exertional limitations are sufficiently severe so as to significantly limit the range of work permitted by the claimant's exertional limitations." Hoopai v. Astrue, 499 F.3d 1071, 1075 (9th Cir. 2007) (citations and quotation marks omitted). In such instances, the testimony of a vocational expert is required. Id.

Here, the ALJ used the grids exclusively to make her Step Five determination that plaintiff could perform jobs requiring "unskilled work at all exertional levels." (AT 23.) Plaintiff asserts this was in error because the ALJ's determination that plaintiff's impairments limited her to only occasional interaction with co-workers and supervisors demonstrates that plaintiff's non-exertional limitations were sufficiently severe so as to significantly limit the range of work permitted by her exertional limitations, thus requiring the ALJ to also use a vocational expert's testimony in making her Step Five determination.

The ALJ, however, specifically found that plaintiff's nonexertional limitations did not compromise plaintiff's ability to perform unskilled work at all levels. (AT 23.) In doing so, the ALJ relied on the regulations, which note that the primary work functions in the bulk of unskilled work relate to working with things, rather than people. (AT 22); see 20 C.F.R. Pt 404. subpt. P. app. 2, § 201.00(i) ("[T]he primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance."); 20 C.F.R. Pt 404. subpt. P. app. 2, § 202.00(g) (stating the same with respect to light work). Given plaintiff's residual functional capacity to perform unskilled work at all exertional levels and the fact that the bulk of unskilled work requires engaging in functions involving things rather than persons, the ALJ did not err in determining that plaintiff's functional limitations concerning her ability to interact with supervisors and coworkers were not so severe as to significantly limit the range of work permitted by the plaintiff's non-existent exertional limitations. Accordingly, there was no error in the ALJ's reliance on the grids.

////

## V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (ECF No. 12) is DENIED.

2. The Commissioner's cross-motion for summary judgment (ECF No. 15) is GRANTED.

3. Judgment is entered for the Commissioner.

4. The Clerk of Court is directed to close this case and vacate all dates.

IT IS SO ORDERED.

Dated: January 22, 2015

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE